IOWA-WISCONSIN BRIDGE COMPANY, a corporation of the State of Delaware, Defendant Below, Plaintiff in Error, *v.* PHOENIX FINANCE CORPORATION, a corporation of the State of Delaware, Plaintiff Below, Defendant in Error.

(*March* 18, 1942.)

HARRINGTON, *Ch.*, LAYTON, C. J., RICHARDS and TERRY, J. J., sitting.

*Daniel F. Wolcott, Fred A. Ontjes* (of Mason City, Iowa), and *William C. Green* (of St. Paul, Minnesota) for plaintiff in error.

*James R. Morford* and *Marvel* and *Morford* for defendant in error.

Supreme Court, January Term, 1941.

LAYTON, Chief Justice:

The plaintiff in error will be referred to as the Bridge Company, the defendant in error as Phoenix.

Phoenix sued in the court below to recover the amounts alleged to be due on two promissory notes made and delivered to it by the Bridge Company, one in the sum of $2,000, the other for $3,125, with interest from their respective dates.

The sole defense relied on was res adjudicata; and in support of that plea there was introduced in evidence the record of a proceeding in the United States Circuit Court of Appeals for the Eighth Circuit entitled, First Trust and Savings Bank and A. H. Schubert, as Trustees, and Phoenix Finance Corporation, appellants, v. Iowa-Wisconsin Bridge Company, a Corporation, Defendant, and Fayette D. Kendrick (and others) Interveners, Appellees, 98 F. 2d 416. Appeal from the District Court of the United States for the Northern District of Iowa, Bechtel Trust Co. v. Iowa-Wisconsin Bridge Co., 19 F. Supp. 127.

The record disclosed a proceeding in equity instituted by Bechtel Trust Company (later First Trust and Savings Bank) and Schubert in the District Court of the United States for the Northern District of Iowa, for the foreclosure of a mortgage or trust deed given by the Bridge Company to the complainants as trustees to secure an issue of bonds, the most of which were held by Phoenix Finance System, Inc., predecessor of Phoenix. The defendant in the court below contended that in the proceeding in the Federal District Court the two notes sued on had been found to be without consideration, and invalid; and that the decree of that court, affirmed by the Circuit Court of Appeals, was entitled to full faith and credit under Article 4, Section 1 of the Constitution of the United States. The plaintiff insisted that it was only a formal party to the proceeding; and that, therefore, its rights in respect of the consideration given and received for the notes for which bonds of the Bridge Company had been issued to it could not have

been lawfully determined; and further, that if it was, in fact, a necessary party to the proceeding, it being a Delaware corporation, as was the Bridge Company, its joinder as a necessary party destroyed the diversity of citizenship on which the jurisdiction of the Federal District Court rested; and, therefore, the pretended adjudication of its rights in respect of the two notes was void.

The cause was heard by the court, trial by Jury having been waived. It was held that the proceedings in the Federal District Court and the decree there rendered did not constitute a valid defense to the action under the plea of res adjudicata. The reasoning of the court was this: In a suit to foreclose a mortgage securing an issue of bonds, the trustee represents all bondholders in all things relating to their common or individual interest in the trust property, or in the bonds; but the trustee cannot, by implication, be held to represent the bondholders beyond the terms of the instrument under which, alone, he has his origin or existence. In the proceeding in the Federal Court, the sole matters related to the bonds as collateral and not to the antecedent debt, and the trustees did not represent the bondholders in respect of the validity of the debt for the security of which the bonds were issued. To adjudicate adversely the rights of the bondholders in respect of the debt underlying the bonds, the bondholders were necessary parties; Phoenix was held to be a formal party only, and it was necessary so to hold, for otherwise the court would have been without jurisdiction, diversity of citizenship having been destroyed. Accordingly, there was no adjudication of the invalidity of the notes sued on. Judgment was rendered in favor of the plaintiff; and this writ of error followed.

The record of the proceedings in the Federal Courts is long. Some of the facts are recited in the opinion of the court below, 1 *Terry* (40 *Del.*) 500, 14 *A.* 2d 386. They are given

at great length in the opinion of the Federal District Court (19 F. Supp. 127), and at less length in the opinion of the Circuit Court of Appeals (98 F. 2d 416), and in another opinion of that court in another phase of the controversy. (8 Cir.), 115 F. 2d 1. Such portions of the mortgage indenture, pleadings and findings of fact will be stated here as are necessary to explain the reasons for our disagreement with the conclusions of the learned court below.

The Bridge Company, a Delaware corporation, owns a toll bridge across the Mississippi River between the States of Iowa and Wisconsin. In 1932, it executed and delivered to Bechtel Trust Company, an Iowa corporation, and A. H. Schubert, a citizen of Wisconsin, as trustees, a mortgage or deed of trust, covering substantially all of its property, including the bridge, to secure a bond issue in the amount of $200,000. Later First Trust and Savings Bank, an Iowa corporation, was substituted as trustee for Bechtel Trust Company. The bonds made express reference to the mortgage indenture for a description of the property mortgaged, the nature and extent of the security created, "and the rights of the holders of said bonds in respect of such security." Under the terms of the indenture, the Bridge Company covenanted, inter alia, to pay all taxes and assessments; to keep its property in thorough repair; to have fire insurance policies so drawn that losses thereunder should be made payable to the trustees; that it would not suffer preferential liens to be created; and in the event of failure to comply with these or any other covenant, the trustees were authorized to advance or expend money to protect the property. The trustees were required to declare all the bonds to be in dafault, and to be due and payable immediately, in the event of certain defaults in the payment of the principal of or interest on any bond, upon the written request of holders of one-fourth in amount of all of the bonds se-

cured by the indenture; and in case of such defaults, the trustees were empowered to enter on the mortgaged premises, and to manage and control the property; or to sell the property; or, upon request of the holders of bonds in the specified amount, the trustees were required to "proceed to protect and enforce their rights and the rights of the bondholders under this Indenture by a suit or suits in equity, or at law, whether * * * for any foreclosure hereunder, or for the enforcement of any other appropriate, legal or equitable remedy, as the trustees, being advised by counsel learned in the law, shall deem most effectual * * *". Specifically, no holder of any bond or coupon was permitted to institute any suit or proceeding for foreclosure, or for any other remedy, except upon notice of the defaults, request by the holders of the bonds in the specified amount, and subsequent refusal of the trustees to act, or unreasonable delay on their part. It was provided that, "in case of such defaults, and upon the demand of the trustees, the company would pay to them for the benefit of the bondholders the whole amount due and payable on the bonds; and for failure so to pay forthwith, the trustees in their own names and as trustees of an express trust would be entitled to recover judgment for the whole amount so due and unpaid * * * either before or after or during the pendency of any proceeding for the enforcement of the lien of the indenture * * *; and in case of a sale of the mortgaged property, and of the application of the proceeds * * * to the payment of the debt, the trustees in their own names and as trustees of an express trust would be entitled to enforce payment of and to receive the amount upon any and all bonds issued and outstanding for the benefit of the holders thereof, and would be entitled to recover judgment for any portion of the debt remaining unpaid, with interest."

Defaults having been declared, at the demand of Phoe-

nix, and through lawyers selected and paid by it, the Trustees filed their bill of complaint in the Federal District Court to foreclose the mortgage. Inter alia, it was alleged "that all of the bonds had been issued for a good and valuable consideration, and were outstanding in the hands of divers owners and holders for value." The bill prayed that an account be taken of the bonds secured by the mortgage, "and of the amount due on said bonds for principal and interest, or otherwise"; that the defendant company be decreed to pay to the complainants the amount found to be due on such accounting; and in default of payment, that the mortgaged property be sold. There were also prayers for a deficiency judgment, and for the appointment of a receiver.

The defendant's answer, in substance, alleged that from and after November, 1930, and until July, 1933, one J. A. Thompson and others in association with him had dominant control both of Phoenix Finance System, Inc., and the Bridge Company; that during the time there had been numerous transactions between the two companies; that the interests of a number of the directors of the Bridge Company conflicted with their interests in the other corporation, and that these transactions should be closely scrutinized by the court; that nearly all of the bonds issued under the mortgage indenture were held by Phoenix Finance System, Inc.; that the records of the company in the hands of its officers did not disclose the considerations, or the dates of sales and transfers of the bonds; that the defendant did not know the exact amount of bonds claimed to have been issued, but a large portion of them had been improperly executed and delivered, and there was a good defense to all or a part of the complainant's claim; and that full investigation should be made as to the validity of the bond issue sued on, and the complainants be compelled to make a

complete showing as to the consideration received by the Bridge Company for the delivery of the bonds.

A receiver was appointed. Thereafter Fayette B. Kendrick, a stockholder of the Bridge Company residing in Minnesota, asked and was granted leave to file a petition of intervention, which was ordered to be taken as an answer to the bill of complaint. The petition charged that Thompson and his associates, in control both of the Bridge Company and Phoenix Finance System, Inc., had fraudulently conspired to have the mortgage executed and the bonds issued for the purpose of defrauding the stockholders of the Bridge Company of their rights and equity of redemption in the company's property; that the bonds issued were without consideration, were held by Phoenix Finance System, Inc., and none had passed to an innocent purchaser for value. The facts and circumstances constituting fraud and illegality in the execution and delivery of the mortgage and want of consideration for the issuance of the bonds were alleged in detail. Kendrick also moved to have Phoenix Finance System, Inc., and Phoenix Finance Corporation made parties; and it was ordered that these corporations be made parties plaintiff in the cause, and parties defendant to the petition of intervention.

At this point Phoenix Finance System, Inc., passed out of the picture. About the time of the distribution of the bonds, Phoenix Finance System, Inc., was liquidated by the simple process of creating a new corporation, called Phoenix Finance Corporation, under the laws of Delaware, officered by the same officers, to which new corporation all of the assets of Phoenix Finance System, Inc., were transferred, the new corporation adopting, with notice, all of the plans of its predecessor and the results of its activities. See 19 F. Supp. at page 139. Phoenix appeared through its counsel, and filed an answer to the petition of intervention dis-

claiming knowledge of the matters alleged; asserting that it owned and held for value a large amount of the bonds of the Bridge Company; and offering to do equity. Warren G. Hays and others were allowed to intervene; and in this condition of the pleadings the cause was referred to a special master. Phoenix's counsel were notified of the time and place fixed for the taking of testimony; and Thompson, Phoenix's President, testified at length as to the considerations given by Phoenix and received by the Bridge Company for the issuance to Phoenix of the Bridge Company's bonds.

The master found that of the bonds issued under the indenture, Phoenix held $177,600, and others held $22,400, in amount. Of the bonds held by Phoenix, all of them, with the exception of $12,125 in amount, were found to have been issued fraudulently and without consideration. The bonds having a valid consideration represented the sum of $9,000 paid by Phoenix on behalf of the Bridge Company in the settlement of a mechanic's lien, and the sum of $3,125, evidenced by the note in suit, paid by Phoenix for taxes due from the Bridge Company to the State of Wisconsin. Of the bonds in the hands of others than Phoenix $15,000 in amount were found to have been issued for value. The master recommended that the mortgage be foreclosed in so far as it related to bonds aggregating $27,125 in amount.

All of the parties, including Phoenix, filed exceptions to the master's report. Phoenix excepted generally to the findings that Thompson and his associates were in control both of the Bridge Company and Phoenix's predecessor at the time the mortgage was executed and the bonds were issued, and had fraudulently brought about their execution and issuance; and, particularly, that certain of the bonds, including those issued in respect of the note of $2,000, in suit, had been issued without consideration.

The District Court, after a careful review of the evidence, approved, with slight modifications, the master's findings, and made additional findings of fact. The Court found as a fact that at the time the mortgage and bonds were executed and issued, Phoenix owed the Bridge Company upwards of $26,000, $14,000 of which represented the value of 140 shares of the Bridge Company's stock which Phoenix had received and disposed of without payment therefor to the Bridge Company. The Court, accordingly, eliminated the items of $9,000 and $3,125 allowed to Phoenix as a valid consideration for bonds issued to it for the reason that it could see no reason why a court of equity should not observe the maxim that "he who hath done iniquity shall not have equity." Foreclosure was denied, the receivership to continue for the purpose of impounding revenues sufficient to discharge the valid bonds amounting to $15,000. It was specifically decreed that the mortgage and bonds in suit had been frauduently executed and issued; and that all of the bonds were without valid consideration with the exception of those aggregating $15,000 in amount held by strangers to the litigation.

Phoenix moved to vacate the decree and to dismiss the bill for want of jurisdiction on the ground that it, as a plaintiff, and the Bridge Company, as defendant, were Delaware corporations. The motion was denied. Thereafter, Phoenix moved for a rehearing and for a modification of the decree, and these motions were also denied. An appeal was allowed. Phoenix challenged the findings of fact and conclusions of law almost in their entirety. The decree was affirmed by the Circuit Court of Appeals. *First Trust & Savings Bank v. Iowa-Wisconsin Bridge Co., supra.* The Supreme Court of the United States denied certiorari, 305 U. S. 650, 59 S. Ct. 243, 83 L. Ed. 420, and a petition for a rehearing, 305 U. S. 676, 59 S. Ct. 356, 83 L. Ed. 437.

We return for the moment to the findings of fact relative to the considerations claimed to have been paid by Phoenix for the issuance of the bonds to it. These considerations are summarized by the Circuit Court of Appeals (98 F. 2d at page 424). Item 6 of the summary is as follows:

"As security for

| | |
|---|---|
| Payment of taxes | $3,125.00 |
| Advancements | 14,610.19 |
| | $17,735.19" |

Bonds to the amount of $20,100 were issued to Phoenix in respect of these claimed considerations. As to this, the Circuit Court of Appeals commented as follows:

"The last $20,100 of bonds were issued to Phoenix as collateral to secure a purported indebtedness of $17,735.19. The master disallowed all but $3,125 which was used to pay taxes. This is a just claim, but is more than off-set by the $14,000 and other items referred to above. $9,806.10 of the amount were furnished by Phoenix to pay interest on bonds held by Phoenix, which were known by the officers of Phoenix to be fraudulent. The transaction amounts to no more than a manipulation to obtain more bonds and increase the secured claim against the Bridge Company. $1505.75 were charged for salaries to Phoenix officers and employees. We find no argument of appellants in defense of this item. The remainder of the claim is for cash items alleged to have been advanced by Phoenix to the bridge company, which, if allowable, are wiped out by the indebtedness of Phoenix to the bridge company."

It is clear from the evidence that the note of $2,000

formed a part of the item of $14,610.19 entitled "advancements" in the Court's summary.

Such, briefly, are the facts. The first question for determination relates to the power of representation conferred on the trustees under the terms and conditions of the trust indenture. If the trustees were clothed with the power of representation to the extent that, in an action to foreclose the mortgage, the debt, or basic consideration for the bonds, could be inquired of and adjudicated, Phoenix was bound by the decree, and diversity of citizenship essential to jurisdiction was not destroyed by the joinder of Phoenix as a proper but not a necessary party.

In the leading case of *Kerrison v. Stewart*, 93 *U. S.* 155, 160, 23 *L. Ed.* 843, it was said with respect to the matter of representation of bondholders by a trustee under a deed of trust, that "under some circumstances, a trustee may represent his beneficiaries in all things relating to their common interest in the trust property. He may be invested with such powers and subjected to such obligations that those for whom he holds will be bound by what is done against him, as well as by what is done by him. The difficulty lies in ascertaining whether he occupies such a position, not in determining its effect if he does. If he has been made such a representative, it is well settled that his beneficiaries are not necessary parties to a suit by him against a stranger to enforce the trust * * *; or to one by a stranger against him to defeat it in whole or in part. * * * In such cases, the trustee is in court for and on behalf of the beneficiaries; and they, though not parties, are bound by the judgment, unless it is impeached for fraud or collusion between him and the adverse party.

"The principle which underlies this rule has always been applied in proceedings relating to railway mortgages,

where a trustee holds the security for the benefit of bond-holders. It is not, as seems to be supposed by the counsel for the appellants, a new principle developed by the necessities of that class of cases, but an old one, long in use under analogous circumstances, and found to be well adapted to the protection of the rights of those interested in such securities, without subjecting litigants to unnecessary inconvenience.

"Undoubtedly cases may arise in which it would be proper to have before the court the beneficiaries themselves, or some one other than the trustee to represent their interests. They then become proper parties, and may be brought in or not, as the court in the exercise of its judicial discretion may determine."

The following decisions are instances of the application of the principle: *Beals v. Illinois & M. & T. R. R. Co.*, 133 *U. S.* 290, 10 *S. Ct.* 314, 33 *L. Ed.* 608; *Elwell v. Fosdick*, 134 *U. S.* 500, 10 *S. Ct.* 598, 33 *L. Ed.* 998; *Richter v. Jerome*, 123 *U. S.* 233, 8 *S. Ct.* 106, 31 *L. Ed.* 132; *Shaw v. Little Rock, etc., R. R. Co.*, 100 *U. S.* 605; 25 *L. Ed.* 757; *Mercantile Trust Co. v. Schlafly*, (8 *Cir.*) 299 *F.* 202; *Kent v. Lake Superior Ship Canal, etc., Co.*, 144 *U. S.* 75, 12 *S. Ct.* 650, 36 *L. Ed.* 352; In re *Franklin Brewing Co.*, (*D. C.*) 254 *F.* 910. See 7 *Fletcher, Cyc. Corp.*, §§ 3262, 3265.

■ Both by substantive law of Iowa (Sec. 10968, Code 1935) and by the Federal equity rule of procedure (Rule 37, 28 U. S. C. A., § 723 Appendix) the trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, may sue in his own name, without joining with him the party for whose benefit the action is brought.

■ ■ The contract here is the mortgage given by the Bridge Company to the trustees for the benefit of the

bondholders. A debt, either in being, or created at the time or contracted to be created, is an essential requisite of a mortgage. Jones, Mortgages, 8th Ed., § 316. Upon a bill filed to foreclose a mortgage, an account must be taken to ascertain the amount due on the instrument or instruments for the security of which the mortgage was given. *Carpenter v. Longan*, 16 *Wall.* 271, 21 *L. Ed.* 313. These principles are elementary.

The mere naming of one as trustee in a mortgage given in trust for the security of bondholders does not, of course, constitute the trustee their representative for all purposes. In a proceeding to foreclose such a mortgage, the delegation of authority to the trustee with respect to the special matter adjudicated must appear expressly, or as a clear implication to be gathered from the terms of the indenture and bonds. Here, the bonds expressly referred to the indenture for a statement of the rights of the bondholders. The bondholders themselves were expressly denied the right to sue for their own protection except in certain defined circumstances. On the other hand, the trustees, upon defaults declared, and upon the request of holders of bonds in the specified amount, were required to proceed to protect and enforce the rights of the bondholders by foreclosure of the mortgage, or for the enforcement of any other appropriate legal or equitable remedy, as might be deemed most effectual. These provisions are broad and comprehensive. *Mercantile Trust Co. v. Schlafly, supra.* They were an essential part of the bonds. *Continental-Equitable Title & Trust Co. v. National Properties Co.,* (*D. C.*) 273 *F.* 967; *Central National Bank v. Bateman & Companies, Inc.,* 15 *Del. Ch.* 31, 131 *A.* 202. Clearly it was to the advantage of the bondholders to have adjudicated both the validity of the mortgage as a lien on the property and the legal sufficiency of the bonds. See *Speers Sand & Clay Works, Inc.,*

*v. American Trust Co.*, (*4 Cir.*) 20 *F.* 2d 333. If both of the objects plainly of benefit to the bondholders could be accomplished under proper pleadings in the foreclosure proceeding, all the rights of the bondholders would be settled. Moreover, a deficiency judgment was prayed for, which, in itself, would seem to require inquiry into the existence and amount of the underlying debt. In these circumstances, it would be difficult, we think, successfully to maintain that the power of representation conferred on the trustees was so narrow as to exclude from inquiry and determination the existence and extent of the consideration underlying the bonds. Essential privity between the trustees and their beneficiaries was not wanting. See *McPherson v. Commercial Building & Securities Co.*, 206 *Iowa* 562, 218 *N. W.* 306. At least, there was no conflict of opinion between the trustees, as representatives of the bondholders, and Phoenix, as the holder of nine-tenths of the bonds, in this regard. The trustees, and, it must be said, Phoenix as well, based their bill of complaint on the theory of a broad power of representation; for they, through counsel chosen and paid by Phoenix, challenged inquiry into the consideration received by the Bridge Company for the issuance of the bonds, and prayed that an account be taken of the amount due on them. Both the defendant's answer and the petition of intervention, taken as such, accepted the challenge by denying the existence of a valid consideration. The issue was sharply and precisely drawn by the pleadings; and there was no effort made by the complainants to reframe their bill, or to have stricken from the answers, as being immaterial or irrelevant, the allegations that the bonds had been issued without valid consideration. Phoenix, likewise, kept silent; and the issues as forced by the complainants in their representative capacity and with, at the least, the tacit approval and consent of Phoenix, embraced both the validity of the mortgage as a lien on the property of the Bridge

Company and the pre-existence of a debt or obligation in support of the bonds for the security of which the mortgage was given. The latter issue evoked a mass of testimony; and on the issue, Thompson, president of Phoenix and of its predecessor, and president as well of. the Bridge Company testified directly and in detail. Full opportunity was afforded the bondholders to show that the Bridge Company had received a fair consideration for the bonds. If the results of the proceeding were disappointing to Phoenix the cause must be attributed to the stubborn facts of the case, and not to any want of time or season for the development of the truth. See 115 F. 2d 1, at pages 6, 7.

■ Having in mind these considerations, we are of opinion that the trustees were empowered to submit for adjudication, as they did, the existence or non-existence of a debt or obligation of the Bridge Company as a consideration for the issuance of its bonds and the execution of the mortgage given to secure them. Accordingly, we think, the District Court was correct in its view that Phoenix was merely a formal party to the proceeding, whose joinder did not destroy the diversity of citizenship upon which its jurisdiction depended; and that the. Circuit Court of Appeals was justified in observing that if Phoenix had not become a party, the District Court could have proceeded to final judgment, granting or denying foreclosure, and could have decided every issue including the validity of the trust deed and the amount of the debt secured thereby; and the decree would have been binding on the bondholders without their presence as parties to the record. The refusal of the United States Supreme Court to review the judgment confirms us in our opinion; for it is not to be supposed that that court would lightly pass over vital questions of jurisdiction and due process of law.

■ It is not within the province of this court to ig-

nore or to dispute the findings of fact as shown by the record. It clearly appears that while the note of $3,125 in suit was a just claim, it was more than off-set by the debt of Phoenix to the Bridge Company; and, likewise, whether the note of $2,000 sued on, represented money actually and honestly advanced by Phoenix to the Bridge Company and allowable at all as a consideration for the issuance of bonds, the debt was also "wiped out" by the same counter-debt. The result of the adjudication was that the debts evidenced by the two notes did not exist in fact when the mortgage and bonds were executed and issued.

██ ██ The appellee contends that the pleadings raised no issue of set-off or counter-claim, and, therefore, the decree in this respect was not responsive to the issues, and is not effective as an adjudication against it. A judgment rendered on matters outside the issues is not, of course, one to which full faith and credit must be given under the Federal Constitution. *Reynolds v. Stockton*, 140 *U. S.* 254, 11 *S. Ct.* 773, 35 *L. Ed.* 464, cited by the defendant in error, is decisive. That authority, however, because of its facts, is of value here only for its clear statement of the principle and the reasons underlying it. And there it was said that, where a judgment is rendered by a court in one state having jurisdiction of the person and subject matter, and which is substantially responsive to the issues presented by the pleadings, the requirements of the full faith and credit clause of the Constitution are fulfilled.

██ ██ As the pleadings were framed and the issues joined, it was, we think, the clear duty of the Federal District Court to determine from the evidence what debt or obligation, if any, was due and owing by the Bridge Company to Phoenix for the issuance of its bonds to the latter company. The pre-existence of a debt as a justification for its security was directly at issue. It was found that Thomp-

son and his associates, in dominant control both of the Bridge Company and Phoenix, had set up fraudulent and non-existing claims in favor of Phoenix against the Bridge Company as a basis for the issuance of bonds and the execution of the mortgage given to secure them. It was decreed that all of the bonds held by Phoenix were without consideration and invalid; and this was undoubtedly true with respect to the amounts represented by the notes in suit, even assuming that the note for $2,000 evidenced an honest debt, for it would have been a denial of natural justice and a perversion of equity to permit Phoenix to say that the amounts of the notes were owing to it by the Bridge Company, and, therefore, it was entitled to have the debts secured by the issuance to it of bonds, when, at the same time, it owed the Bridge Company a much larger debt arising from frauds practiced on it by Phoenix. The cancellation of the debts represented by the two notes, with the resulting denial of them as an underlying consideration for the issuance of bonds, was but an application of the principle of equitable set-off, and, in any event, was a determination substantially responsive to the broad issue presented by the pleadings and the intervener's prayer for general equitable relief. See *Central Appalachian Co. v. Buchanan*, (6 *Cir.*) 90 *F*. 454. Error in this respect was assigned by Phoenix in its appeal, and was overruled. If error, it is not reviewable here. See *Roche v. McDonald*, 275 *U. S.* 449, 48 *S. Ct.* 142, 72 *L. Ed.* 365, 53 *A. L. R.* 1141.

■■ The doctrine of res adjudicata is recognized by all civilized nations as a rule of expediency, justice and public policy which demands that there be an end of litigation. The full faith and credit clause of the Federal Constitution affords a useful means to that end. Without that provision and implementing Acts of Congress, the judgment of a court of one state would stand in the tribunals of other

states of the United States in no better position than would a judgment of a foreign country, to be respected, if at all, on the principles of comity. With the provision, the judgment of a state court having jurisdiction of the parties and subject matter is accorded in the courts of sister states the same faith and credit which it has by law or usage in the court where it was rendered. The same sanctity and effect is granted to a judgment of a federal court, rendered in a like case and in similar circumstances, as is conceded to a judgment of a state court.

The judgment of the Federal Court was entitled to full faith and credit, and it constituted a complete defense to the action on the notes under the plea of res adjudicata.

The judgment of the court below is, therefore, reversed with the direction that judgment be entered for the defendant.